# EXHIBIT A



**Computershare Governance Services, Inc.**

100 Beard Sawmill Road, Shelton, CT 06484

10/04/2023

Zimmer Biomet Spine, Inc.
Toni  Dahms Sr. Paralegal & EBI HIPAA Privacy Officer at ZimVie
ZimVie
10225 Westmoor Drive
Westminster CO 80021

# SERVICE OF PROCESS NOTICE

Item: 2023-22

The following is a courtesy summary of the enclosed document(s).   **ALL information should be verified by you.**

Note: Any questions regarding the substance of the matter described below, including the status or how to respond, should be directed to the contact set forth in line 12 below or to the court or government agency where the matter is being heard.

| | | |
|---|---|---|
| 1. | **Entity Served:** | Zimmer Biomet Spine, Inc. |
| 2. | **Title of Action:** | Lana Horne vs. Zimmer Biomet Spine, Inc. |
| 3. | **Document(s) Served:** | Summons<br>Plaintiff's Amended Complaint |
| 4. | **Court/Agency:** | Broward County Circuit Court Seventeenth Judicial Circuit, Florida |
| 5. | **State Served:** | Florida |
| 6. | **Case Number:** | CACE23-00873 |
| 7. | **Case Type:** | Strict Liability Manufacturing Defect |
| 8. | **Method of Service:** | Hand Delivered |
| 9. | **Date Received:** | Wednesday 10/04/2023 |
| 10. | **Date to Client:** | Wednesday 10/04/2023 |
| 11. | **# Days When Answer Due:**<br>**Answer Due Date:** | 20<br>Tuesday 10/24/2023 | CAUTION: Client is solely responsible for verifying the accuracy of the estimated Answer Due Date. To avoid missing a crucial deadline, we recommend immediately confirming in writing with opposing counsel that the date of the service in their records matches the Date Received. |
| 12. | **Sop Sender:**<br>(Name, City, State, and Phone Number) | Kenneth D. Cooper<br>Fort Lauderdale, FL<br>954-522-7177 |
| 13. | **Shipped To Client By:** | Email Only with PDF Link |
| 14. | **Tracking Number:** | |
| 15. | **Handled By:** | 101 |
| 16. | **Notes:** | Please note that the last page of the complaint is a prayer for relief with eight causes of action. |

NOTE: This notice and the information above is provided for general informational purposes only and should not be considered a legal opinion. The client and their legal counsel are solely responsible for reviewing the service of process and verifying the accuracy of all information. At ComputerShare, we take pride in developing systems that effectively manage risk so our clients feel comfortable with the reliability of our service. We always deliver service of process so our clients avoid the risk of a default judgment. As registered agent, our role is to receive and forward service of process.  To decrease risk for our clients, it is not our role to determine the merits of whether service of process is valid and effective.  It is the role of legal counsel to assess whether service of process is invalid or defective. Registered agent services are provided by United Agent Group Inc.

IN THE CIRCUIT COURT OF THE
SEVENTEENTH JUDICIAL CIRCUIT, IN
AND FOR BROWARD COUNTY,
FLORIDA

Lana Horne

        CASE NO. **CACE23-00873**

        Plaintiff

vs.

        S U M M O N S

        ON CORPORATION

Zimmer Biomet Spine, Inc.,

        Defendant

_____/

THE STATE OF FLORIDA

To all and singular the Sheriffs of said State:

        YOU ARE HEREBY COMMANDED to serve this summons and a copy of the complaint or petition in this action on Defendant, Zimmer Biomet Spine, Inc.,
BY SERVING:    Zimmer Biomet Spine, Inc., BY SERVING THEIR REGISTERED AGENT,

UNITED AGENT GROUP INC.
801 US HIGHWAY 1
NORTH PALM BEACH, FL 33408

OR: BY SERVING: The President, or Vice-President or other head of the corporation; or in their absence, the cashier, treasurer, security or general manager; or in their absence, any director; or in their absence, any officer or business agent in accordance with Florida Statute 48.081.

Each Defendant is required to serve written defenses to the Complaint or Petition on KENNETH D. COOPER, Plaintiff's Attorney, whose address is 400 S.E. 8th Street, Fort Lauderdale, Florida 33316, (954) 522-7177, within twenty (20) days after service of this summons on that Defendant, exclusive of the day of service, and to file the original of the defenses with the Clerk of this Court either before service on the attorneys or immediately thereafter. If a defendant fails to do so, a default will be entered against that Defendant for the relief demanded in the Complaint or Petition.

        WITNESS my hand and the Seal of said Court this ____ . ___**SEP 26 2023**____

        Clerk of the Circuit Court

        By:_____
        As Deputy Clerk

430

**BRENDA D. FORMAN**

IN THE CIRCUIT COURT OF THE 17TH JUDICIAL CIRCUIT,

IN AND FOR BROWARD COUNTY, FLORIDA

Lana Horne

        Plaintiffs                               Case No.: CACE-23-008373

vs.

Zimmer Biomet Spine, Inc.,

        Defendants.

_____/

## PLAINTIFF'S AMENDED COMPLAINT

COMES NOW the Plaintiff, Lana Horne, and hereby files her complaint and alleges as follows:

## JURISDICTION AND VENUE

1. The Broward County Circuit Court has jurisdiction over ZBS because it is a corporation that has routine and continuous contact with the State of Florida by virtue of the fact that it advertises and sells its product in this State, it recruits and employs individuals in this State and conducts business with its customers and business associates in this state and it is registered to do business in this State.

2. ZBS intentionally avails itself of the benefits and protections of Florida law such that the exercise of jurisdiction over it by the Florida Courts is consistent with traditional notions of fair play and substantial justice.

1

3. Venue is proper in this court pursuant to Florida Statute 47.011 in that none of the Defendants reside in Florida and Plaintiff has designated the Circuit Court of Broward County as the County to try this case.

## PARTIES

1. At all times material to this complaint, the Plaintiff, Lana Horne, was a resident of Broward County, Florida and sui juris.

2. Upon information and belief, Defendant ZBS is a Delaware corporation with its principal place of business in 10225 Westmoor Dr., Colorado 90021 and is presently qualified for the transaction of intrastate business with the State of Florida.

3. Plaintiff has informed and believe and, on the basis, thereof alleges that Defendants were responsible for the design, manufacturing, development, research, testing, inspection, packaging, mass-production, advertisement, promotion, supply, distribution, sale, delivery, instructions on, warnings about, and labeling of the Device which injured Plaintiff as described herein.

## SUMMARY OF THE ACTION

4. This complaint against ZIMMER BIOMET SPINE, INC. ("ZBS"), relating to a defective Mobi-C artificial disc ("DEVICE") manufactured, and or designed and or sold by ZBS which failed.

5. The Device placed in Plaintiff's body was designed, manufactured with a defect, and breached their express and implied warranties, was defective and unreasonable dangerous for its intended use because it deviated in or more ways from the approved specifications, manufacturing methods or testing methods. Defendants were negligent in the design, manufacture, and labeling of the Device and knew that its devices were failing at an alarming and unacceptable rate and yet they continued to produce defective devices knowing full well of the high risk of failure.

6. The Device implanted in Plaintiff was designed, manufactured, and sold in violation of federal law and in violation of ZBS's federally approved device specifications. It contained a latent defect not disclosed to the Food and Drug Administration ("FDA", was adulterated, breached ZBS's express and implied warranties, and was defective and unreasonably dangerous for its intended use. ZBS was negligent in the design, manufacture, and labeling of the Device and was negligent in its dissemination of product failures and issues with the Device.

7. Defendants are liable to plaintiff for all consequential damages Plaintiff has incurred as a result of injuries to Plaintiff. Defendants are liable for Plaintiff's pain, suffering, permanent disability, revision surgery, continued damage to her spine as a result of the defective product, and subsequent surgery. Defendants are liable for any and all other damages sustained by Plaintiff. Plaintiff demands a trial by jury.

8. State law claims of negligence and strict liability in designing, manufacturing, marketing, and distributing the Device is not preempted by Medical Device Amendments (MDS), even though the product is a class III device because the claims parallel federal requirements, it is not different form or in addition to the duties mandated by federal law, and state law requirements imposed by negligence or strict liability are specifically developed with respect to medical devices. Federal Food, Drug, and Cosmetic Act §§510(k), 513(a)(1)(c), 515, as amended 21 U.S.C.A. §§360(k), 360(a)(1)(c), 360e; 21 C.F.R. §886.4275. *Medtronic, Inc. v Lohr* 518 U.S. 470 (1996). In *Medtronic*, a majority of the court agreed that section 360k did not act as a bar. The court held that the claims alleging defective manufacturing and labeling could proceed to the extent they were based on a violation of Federal Laws which give rise to recovery under state law even in the absence of the FDCA. These parallel state law claims are not preempted by the FDCA.

9. Plaintiff is thus suing for conduct that violates FDCA and State Law.

## FACTUAL BACKGROUNG

### I.    DISC REPLACEMENT

10. The natural cervical intervertebral disc is a remarkable mechanic structure from an engineering perspective. It has the ability to absorb a large compressive load while still providing an impressive range of motion between the bones in the neck. Degenerative disc disease, typically from repetitive stresses experienced during the normal aging process, accounts for the large majority of operative conditions affecting the spine. The disease progression involves gradual weaking and thinning of the shock absorbing intervertebral discs. The progressive changes in the discs can lead to a host of conditions, including osteoarthritis, herniated disc, and spinal stenosis.

11. Anterior cervical discectomy and fusion (ACDF) was historically the instrumented standard of care for the treatment of cervical disc disease. ACDF surgery decompresses the spinal nerves by removing the diseased cervical disc material, ant then stabilizes the vertebral segment by inserting bone grafts, interbody devices, and/or fixation systems including screws and plates.

12. ACDF process eliminates the natural motion of treated segments, it is widely accepted to include hypermobility and heightened intradiscal pressures at adjacent levels after surgery. Treatment with ACDF accelerates degeneration of adjacent spinal levels post-surgery.

13. Like fusion, cervical total disc replacement (cTDR) or artificial disc replacement (ADR) removes the diseased cervical disc and restores the natural disc heigh, decompressing the nerves causing pain. ADR devices are designed to maintain normal spinal motion at the operated vertebral segments. By preserving segmental motion as well as overall cervical spine biomechanics, cTDR has been shown to maintain operative preoperative intradiscal pressures in adjacent segments.

14. As the name implies, an artificial disc replacement ("ADR") is designed in such a way that it

4

imitates normal anatomy. Several artificial cervical discs have been developed and are available as a surgical option to treat cervical disc problems that cause chronic neck pain and other symptoms.

15. The Mobi-C Cervical Disc (Mobi-C) (aka "Device") was first introduced outside the United States (US) in November 2004 by LDR Spine, now part of Zimmer Biomet, and has been implanted over 40,000 times. In 2006, LDR Spine initiated an Investigational Device Exemption (IDE) trial to obtain Food and Drug Administration (FDA) approval for use of Mobi-C in the US.

16. In 2013, the Mobi-C got FDA approval for both one- and two-level implantation. See PMA P110002 and P110009.

17. In 2015, FDA approved an update to the Mobi-C labeling to include five-year clinical results.

## II.    THE MOBI-C ® Device

18. The Mobi-C® is a weight-bearing implant comprised of an ultra-high-molecular-weight polyethylene (UHMWPE per ISO 5832-4) mobile insert sandwiched between two spinal plates consisting of cobalt, chromium, molybdenum (CoCrMo per ISO 5832-12) allows with titanium (per ASTM F1580) and hydroxyapatite (per ISO 13779) plasma spray coating.

19. The Mobi-C ® UHMWPE mobile insert consists of standard (symmetric) convex spherical dome that is radiolucent. The mobile insert articulates with both the superior and inferior device endplates, the inner contact surfaces of which are spherical and flat, respectively. The bottom of the mobile insert contains a grooved feature to enhance lubrication of the mobile insert and inferior endplate surfaces with bodily fluids.

20. The mobile insert is self-centering on the inferior endplate. Each movement of the superior endplate induces the mobile insert to reposition on the inferior spinal plate, which maintains the

5

superior versus inferior vertebral alignment.

21. The mobile insert is designed to articulate between the superior and inferior spinal plates, which allows for multiaxial motion, including five independent degrees of freedom that include two translational and three rotational.

22. The Mobi-C® device is provided to surgeons pre-assembled in sterile packaging ready for use. All Mobi-C ® components are sterilized using gamma radiation at a minimum does of 25 kGy.

23. When correctly manufactured without defects the Mobi-C Prosthesis should withstand the expected physiologic loads in the cervical spine without breakage.

24. The Mobi-C is a class III medical device and received CE Mark approval in 2004.

25. Although Medical Device Amendments ("MDA") established a separate regime of premarket approval for new Class III devices, it grandfathered many that were already on the market. Devices sold before the MDA's effective date may remain on the market until the FDA promulgates, after notice and comment, a regulation requiring premarket approval. §§360c(f)(1), 360e(b)(1). A new device need not undergo premarket approval if the FDA finds it is "substantially equivalent" to another device exempt from premarket approval. §360(c)(f)(1)(A)

### III.      Federal Regulations that ZBS was Required to Follow

26. A device is deemed to be "adulterated" if, among other things, it fails to meet established performance standards, or if the methods, facilities, or controls used for its manufacture, packaging, storage, or installation are not in conformity with federal regulations pursuant to 21 U.S.C. §351 and 21 C.F.R. Part 820 (c).

27. A device is deemed to be misbranded if among other things, its labeling is false or misleading in any particular way, or if it is dangerous to health when used in the manner prescribed,

recommended or suggested in the labeling thereof. See 21 U.S.C. §352.

28. ZBS is required to comply with applicable FDA regulations, including FDA regulations relating to records and reports, in order to prohibit the introduction of medical devices that are adulterated or misbranded and to assure the safety and effectiveness of its medical devices.

29. Adverse events associated with a medical device must be reported to the FDA within 30 days after the manufacturer becomes aware that a device may have caused or contributed to death or serious injury, or that a device has malfunctioned and would be likely to cause or contribute to death or serious injury if the malfunction was to recur. Such reports must contain all information reasonably known to the manufacturer, including any information that can be obtained by analysis, testing, or other evaluation of the device, and any information in the manufacturer's possession. In addition, manufacturers are responsible for conducting an investigation for each adverse event and must evaluate the cause of the adverse event. See 21 C.F.R. Part 803.50

30. Manufacturers of medical devices must also describe every individual adverse event repot whether medical action was taken in regard to the adverse event, and whether the remedial action was reported to the FDA as a removal or correction of the device. See 21 C.F.R. Part 803.52.

31. Manufacturers must report to the FDA in five business days after becoming aware that a medical device reportable event necessitates remedial action to prevent an unreasonable risk of substantial harm to the public health. Medical device reportable events require the manufacturer to conduct a trend analysis that necessitates remedial action to prevent unreasonable risk of substantial harm to public health. See 21 C.F.R. 803.53.

32. Device manufacturers must report promptly to the FDA any device corrections and removals and maintain records of device corrections and removals. FDA regulations require submission of a written report within 10 working days of any correction or removal of a device initiated by the manufacturer to reduce a risk to health posed by the device, or to remedy a violation of federal

7

law caused by the device that may present a risk to health. The written submission must contain, among other things, a description of the event giving rise to the information reported and the corrective or removal actions taken, and any illness or injuries that have occurred with the use of the device, including reference to any device report numbers. Manufacturers must also indicate the total number of devices manufactured or distributed which are subject to the correction or removal and provide a copy of all communications regarding the correction or removal. See 21 C.F.R. Part 806.10.

33. FDA publishes all adverse event reports in a searchable Internet database ("MAUDE") physicians and the general public can use, and if defendants had fulfilled their duty to report adverse events in a timely fashion as required under federal law, the FDA would have issued its draft guidance before plaintiff and her physician made the decision to implant the device or in the alternative would have not have identified the defect sooner and explanted the device impeding any further permanent degradation.

34. Pursuant to federal regulations, the siege GMPS require compliance with the following quality system regulations:

- Manufacturers must meet design-control requirements, including without limitation, conducting design verification and validation to ensure that devices can form to defined use needs and intended uses;

- Manufacturers must establish purchasing controls to ensure that all purchased products, parts and components conform to the specified requirements;

- Manufacturers must meet quality standards in manufacturing and production;

- manufacturers must establish and maintain procedures for implementing corrective actions and preventive actions;

- Manufacturers must investigate the cause of nonconforming product and take corrective action to prevent reoccurrence;

- Manufacturers are required to review and evaluate all complaints and determine whether an investigation is necessary;

- Manufacturers are also required to use statistical techniques where necessary to evaluate product performance.

  See generally 21 C.F.R. Part 820

35. The CGMPs required that ZBS adequately validate all devices by testing production lots under or simulated use conditions. 21 C.F.R. Part 820.30(g)

36. The CGMPs Required ZBS to investigate the cause of device failure in its implants and to take corrective action to prevent reoccurrences and to investigate clinical complaints from patients reporting erratic or non-functioning implants.

37. As stated above, manufacturers failure to comply with C GCMS applicable to a device renders the device adulterated under FDCA., 21 U.S.C. §351(h); 21 C.F.R. Part 820.1(c). Each introduction of an adulterated device into Interstate commerce is a violation of the FDCA. 21 U.S.C. §331(a).

38. A device is deemed adulterated if the methods used in, and the facilities and controls used for, its manufacture, packaging, storage, and installation are not in conformity with CGMP requirements. Each introduction of an adulterated device into Interstate commerce is a violation of federal law. 21 U.S.C. §331(a).

39. FDA regulations require manufacturers to submit premarket approval application ("PMA") supplements for the changes that may affect the safety or effectiveness of a device, including "[t]he use of a different facility or an establishment to manufacture" the device, and "[c]hanges in

9

the performance are designed specifications, circuits, components, ingredients, principle of operation, or physical layout of the device." 21 C.F.R. Part 814.39(a)(3) and (6)/ Such supplements are referred to as "180 days PMA supplements".

40. Any change in specifications of the material used in manufacture requires a 180-day PMA supplement. A manufacturer may make a change to a device without filing a PMA supplement only if the change does not affect the devices safety or effectiveness and the change is reported to FDA in post approval periodic reports. 21 C. F. R. Part 814.39(b).

41. A device lacking necessary PMA approval (including approval of supplements) is deemed adulterated. 21 U.S.C. §351(f)(1)(B).

42. Federal regulations require that PMA supplement be submitted when unanticipated adverse effects increase the incidence of anticipated adverse effects or device failures necessitate a labeling, manufacturing, or device modification. See 21 C.F.R. Part 814.39. ZBS did not submit a PMA supplement as required when the incidence of adverse effects were higher than expected.

43. After FDA has approved a PMMA, an applicant must submit a PMA for review and approval by FDA before making any change affecting the safety or effectiveness of the device unless FDA has advised that an alternate type of submission is permitted for a particular change. All changes must meet the requirements of the quality system regulation (current good manufacturing practices) under 21 CFR part 820 including the design control requirements under §820.30. Changes for which an applicant must submit a PM a supplement include, but are not limited to, the following types of changes if they affect the safety or effectiveness of the device:

- New indication for use of the device;

- Labeling changes;

- The use of a different facility or establishment to manufacture, process, or package the

device;

- Changes in manufacturing methods, or quality control procedures;

- Changes in sterilization procedures;

- Changes in packaging;

- Changes in the performance or design specifications, components, ingredients, principles, or physical layout of the device; And

- Extension of the expiration date of the device based on data obtained under a new or revised stability or sterility testing protocol that has not been approved by the FDA. [if the protocol has been previously approved by the FDA, of supplement is not submitted but the change must be reported to FDA in the post approval periodic reports as described in §814.39(b)]

44. Upon information and belief, ZBS failed to submit design data and documents relating to the use of changes in the manufacturing process, changes in sterilization procedures and changes in its testing procedures for the Device after it had received the original PMA approval.

45. Upon information and belief, the specifications of the device that injured plaintiff differed from those that the FDA had previously approved in one or more ways which affected the safety and efficacy of the Device.

46. Upon information and belief, the composition of the device and the UHMWPE was different, resulting in a different characteristic of the Device when exposed to normal loads.

47. Upon information and belief there was a different mechanical configuration of the final Device which caused the device to break when exposed to normal spine loads.

48. Changes in the manufacturing, design and testing affected the safety and effectiveness of the

11

Device, yet NZBS neither filed a 180-day PMI supplement nor a 30-day notice under 21 U.S.C. §360e(d)(6)(A)(i); 21 C.F.R. Part 814.39.

49. Upon information and belief, ZBS failed to report the increased incidence of Device failures nor did ZBS do any further analysis on these devices to determine the cause of the failure.

## IV.    PLAINTIFF'S INJURIES RELATED TO THE DEFECTIVE DEVICE

50. In 2017, plaintiff underwent artificial disc replacement ("ADR") with the Mobi-C ("Device"). In young, active patients such as her ACR is preferred because it is designed to maintain postoperative neck mobility at the involved levels and allows for rapid return to activity and offers less risk of adjacent level degeneration.

51. After her C4-C5 disc replacement in 2017she had a reoccurrence of progressive neck pain unresponsive to supportive care period

52. CT showed that she had developed spondylolisthesis Where she had the artificial MOBI-C disc placed. She also had significant artifact arthropathy on one side.

53. Her MRI showed an artifact present and had significant axial neck pain and was determined to have grade 2 spondylolisthesis and advance fact arthropathy with significant canal compromise at the C4C5 level where she had implanted the MOBI-C

54. After numerous visits to her physicians, she was scheduled to remove the MOBI-C implant and undergo a permanent fusion operation on September 30th, 2020.

55. The surgery was performed by her surgeon using an anterior approach in which he noted that the MOBI-C implant had fractured at the location of the polyethylene insert.

56. Plaintiff underwent posterior fusion of C4-C6 losing nearly all mobility in her neck.

12

57. As a result of the MOBI-C failure, plaintiff had to undergo a painful revision surgery where even more of her cervical spine was fused.

58. To date plaintiff's injuries and revision surgery have cost several hundred thousand dollars. She has further suffered both post and future wage loss and as well as pain and suffering. Prior to the MOBI-C failure, plaintiff was an active and productive member of society and took pride in her work period the failure of the MOBI-C implant approximately caused her pain and suffering which has been extreme and all but unbearable. She has endured constant, excruciating pain, which has prevented her enjoyment of life for years now.

59. As a result Of the MOB I-C failure, she has suffered from chronic pain, sadness, depression, anxiety, and requires chronic pain management medications. Under condition will continue to deteriorate as time progresses and she will need further surgeries and medical care.

60. She is more susceptible to damage to her spinal cord, her esophagus and at constant risk of infection.

61. She continues to experience inadequate symptom relief after the revision surgery and has experienced a marked decline in mobility and pain. There's further and additional risk of damage to the surrounding disk and the eventual failure in the future.

62. Given plaintiffs young age and her life expectancy given her previous good health and active lifestyle, the injuries she has sustained will have a marked effect on her overall well-being.

63. Upon information and belief ZBS, failed to submit design data and documents relating to the use of changes in the manufacturing process, change in the sterilization procedures and changes in the testing procedures for the Device after it had received the PMA approval.

64. Upon information and belief, the specifications of the Device that injured plaintiff differed from those that the FDA had previously approved in one or more ways in which affected the safety and

13

efficacy of the Device.

## COUNT I

## STRICT LIABILITY MANUFACTURING DEFECT

## IN FLORIDA

65. Plaintiff incorporates by reference the factual allegations of the preceding paragraphs as if fully set forth herein.

66. Defendant, ZBS, manufactured the disc implant in a defective condition that was unreasonably dangerous to Plaintiff.

67. The disc implant left the defendant's possession in a defective state.

68. The disc implant reached plaintiffs with a substantial change in the condition in which it was sold by the defendant.

69. Defendants knew or should've known that they implant was to be used without inspection for defects.

70. The implant was defective in that it was not capable of handling the weight of normal spinal loads and failed under the stress and weight of normal activity.

71. The defective nature of the implant was a proximate cause of injury to plaintiff.

72. As a result of the failure of the disc, plaintiff, suffered bodily injury resulting in pain and suffering, disability, disfigurement, mental anguish, loss of capacity for the enjoyment of life, medical bills, past and future earnings. The losses are permanent in nature and plaintiff will suffer the losses and impairment in the future.

14

73. The device applied to plaintiff is defective, because it was not manufactured to its own design specifications and deviate it from other devices in one or more ways.

74. ZBS was required to comply with the C GMP, 21 C. F. R. Part 820, and other applicable FDA regulations.

75. The CGM P required that ZBS adequately validate the devices by testing production lots under actual or simulated use conditions as required by 21 C. F. R. Part 820.30(g).

76. ZBS is and was required to qualify all critical components at the component level prior to implantation in the human body.

77. Upon information and belief, the UMWPE component was not properly qualified as it was defective with respect to at least one parameter and deviated from the specifications under which it was approved.

78. ZBS is and was required to test the device in an environment that mimics the environment in which the device is to be implanted, I. E. The human body.

79. ZBS did not conduct simulated life testing of the device in an environment which mimics the human body which ultimately would have revealed the defect.

80. ZBS is responsible for the qualification of a medical device and its critical components, not the FDA.

81. ZBS is responsible for the validation of a medical device, not the FDA.

82. ZBS is responsible for supplier quality and audits, not the FDA.

83. ZBS is responsible for performing failure analysis testing on returned (explanted) devices, not the FDA.

84. ZBS is responsible for tracking and trending reasons for device failure, not the FDA.

15

85. ZBS is responsible for determining the root cause of the device failure, not the FDA.

86. Upon information and belief, the Device implanted in plaintiff deviated from the specification and was unable to withstand the normal cervical load causing the Device to break apart. The deviation was the proximate cause of the product failure and injury to the plaintiff and the corresponding damages.

87. Upon information and belief, the Device suffered from other manufacturing defects and that it deviated from the sterilization procedure and did not contain the proper antioxidants to prevent oxidative degradation in the UHMWPE.

88. Upon information and belief, the device also deviated in a material way from the PMA S30, the original PMA or any of the preceding PMA supplements that were relevant to the Device.

89. Nothing in §360k denies Florida the right to provide a traditional damages remedy for violations of common law duties when those duties parallel federal requirements. Even if it may be necessary as a matter of Florida law to provide that those violations were a result of negligent conduct, or that the created an unreasonable hazard for users of the product, such additional elements of the state law cause of action would make the state requirements narrower, not broader, than the federal requirement. Such a narrower requirement would surely provide a strange reason for finding preemption of a state rule insofar as it duplicates the federal rule. "The presence of a damages remedy does not amount to the additional or different 'requirement' that is necessary under the statute; Rather, it merely provides another reason for manufacturers to comply with identical existing 'requirements' under federal law." *Medtronic, Inc. v Lohr*, 518 U.S. 470 (1996).

90. As detailed in this complaint, ZBS is liable for the damages resulting from the defective Devices because, ( 1 ) ZBS [manufactured/distributed/sold] the device; ( 2) as evident by the failure of the UHMWPE component, the Device contained a manufacturing defect when it left ZBS's

possession; ( 3 ) plaintiff was harmed by the defective device; and (4) the Device's defect was a substantial factor in causing plaintiffs harm.

## COUNT II

## STRICT LIABILITY DESIGN DEFECT

91. Plaintiff incorporates by reference the factual allegations of the preceding paragraphs as if fully set forth herein.

92. At all relevant times, defendants were in the business of and did design, develop, formulate, manufacture, test, package, promote, label, advertise, market, instruct on, distribute, supply, and/or sell ZBS MOBI-C devices including the Device implanted in plaintiff.

93. `Defendants placed the device used by plaintiff, into the stream of commerce.

94. Upon information and belief, the Device supplied to the plaintiff was effectively designed, because of degradation of the plastic component resulting in breakage under normal spinal loads.

95. Upon information and belief ZBS did not adequately consider oxidative stress during sterilization process and or did not properly validate the UHMWPE component under normal real-life conditions prior to its use by plaintiff.

96. The device was defective at the time, and they were placed in the stream of commerce by defendant in that the Device and its component parts contained a design defect when the product left defendant's possession because the product at issue herein, did not operate safely as an ordinary consumer would have expected at the time of use, in that: the product quality was

17

inconsistent.

97. In an ordinary consumer would not have expected the product to fail and cause pain after implementation in the manner that occurred with plaintiff.

98. Plaintiff was harmed by the product and the device failed and caused plaintiff to undergo painful and risky revision surgery and resulted in her complete disability from work.

99. The design defects, described above, and the device, was a direct and proximate cause of the plaintiff's injuries described herein.

100.    As a direct and proximate cause of the defect, plaintiff suffered, and will continue to suffer, personal injuries, including but not limited to, medical bills, scarring and discoloration, loss of past and future earnings, severe emotional distress and anxiety, general damages, and other economic and non-economic damages in an amount to be proven at trial.

101.    Accordingly, ZBS is liable for the damages under a strict liability theory irrespective of any other violations of federal or state laws or failure of ZBS to adhere to its own design specifications. As stated by the Supreme Court in *Lohr* "nothing in preemption provision of Medical Device Amendments (MDA) denies states right to provide traditional damages remedy for violations of common law duties when those duties parallel federal requirements, and MDA does not preempt state or local requirements that are equal to, or substantially identical to, requirements imposed by or under Food, Drug, and Cosmetic Act; presence of damages remedy does not amount to additional or different "requirement" under MDA, but merely provides another reason for manufacturers to comply with identical existing "requirements" under federal law." *Medtronic, Inc. v Lohr* 518 U.S. 470 (1996).

## COUNT III

18

## STRICT LIABILITY FAILURE TO WARN

102.     Plaintiff incorporates by reference the factual allegations of the preceding paragraphs as if fully set forth herein.

103.     The Device lacked sufficient warning of potential risks/side effects.

104.     The ordinary consumer, patient, or surgeon would not have recognized the potential risks/side effects of the UHMWPE breaking as it did under normal spinal loads.

105.     That the lack of sufficient instructions and warnings was a substantial factor in causing Plaintiff's harm. The warnings must be given to the prescribing physician and must include the potential risks, side effects, or allergic reactions that may follow the foreseeable use of the product. ZBS had a continuing duty to warn physicians as long as the product was in use.

106.     Upon information and belief ZBS was aware of an increase in the incidence of device failures similar to that of plaintiff but failed to adequately provide warnings to the FDA or surgeons. Continued approval of the Device was contingent upon ZBS's submission of periodic reports, required under 21 CFR 814.84.

107.     Continued approval of the Device was contingent on ZBS's submission of periodic reports, required under 21 CFR 814.84.

108.     Additionally, 21 CFR 814.84(6)(4) requires PMA annual reports submitted after September 24, 2014, to identify each device identifier currently in use for the subject device and the device identifiers for devices that have been discontinued since the previous report.

109.     In addition to the above, and in order to provide continued reasonable assurance of the safety and effectiveness of the device, the Annual Report must include, the frequency and prevalence of adverse events, as FDA evaluates the continued safety and effectiveness of the

19

device.

110.     For example, in accordance with the Medical Device Reporting (MDR) regulation 21 CFR 803.50 and 21 CFR 803.52, ZBS was required to report adverse events for this Device to FDA no later than 30 calendar days after the day received or otherwise becomes aware of the information, from any source, that reasonably suggests that the Device may have caused or contributed to serious injury or has malfunctioned and such device or similar device marketed by the manufacturer would be likely to cause or contribute to a death or serious injury if the malfunction were to recur.

111.     Plaintiff and/or plaintiff's physicians justifiably relied upon defendant's representations regarding the device and choosing it over other products for plaintiff's ADR's.

112.     Defendants knew about but failed to inform the FDA and surgeons and consumers of the risks presented, thereby preventing consumers, including plaintiff, from eliminating or reducing the risk.

113.     "[T]he doctrine of strict liability may not be restricted on the theory of privity of contract period since the doctrine applies even where the manufacturer has attempted to limit liability, they further make it clear that the doctrine may not be limited on the theory that no representation of safety is made to the bystander. If anything, bystanders should be entitled to greater protection then the consumer or user were injured bystanders from the defect is reasonably foreseeable. In short, the bystander is in greater need of protection from defective products which are dangerous, and if any distinction should be made between bystanders and users, it should be made, contrary to the position of the defendant, to extend greater liability in favor of the bystander." (*Elmore v American Motor Corp.* (1969) 70 Cal.2d 578, 586 [75 Cal.Rptr. 652, 451 P.2d 84].)

114.     Defendants also marketed the subject device in a defective manner and that defendants failed to effectively warn or inform consumers of the unreasonable dangerous properties of the

20

subject devices and methods by which consumers, such as the plaintiff, could guard and or mitigate such dangers by choosing alternative devices.

115. By failing to inform surgeons, the FDA and the public at large about the known defect rate and failures attributed to the defect, many patients continue to troubleshoot their implants longer than they would have otherwise had to endure had they known the issue wasn't known defect. Plaintiff live with excruciating pain after her implant had failed.

116. Upon information, ZBS downplayed or omitted the known risk of failure of the device. ZBS knew of certain dangers or defects in their products but failed to warn the FDA, which means the physicians using the device would not, in turn, have been able to adequately advise patients such as plaintiff of the risk and benefits of the operation in order to obtain informed consent. (*Hurley v Lederle Lab. Div. of American Cyanamid* (5th Cir. 1988) 863 F.2d 1173, 1179-1180 [factual question presented as to whether a drug manufacturer withheld from the FDA necessary information on which to base the warnings physicians were to give to their patients].)

117. For instance, plaintiff had to return to her physician several times with recurrent issues with her implant only she put through intrusive and painful costly exams because ZBS had hidden the defective nature of the product from the public.

118. ZBS's failure to warn of the known dangers and known failures of the device in contravention of the federal requirements therefore also violates Florida strict liability laws on failure to warn.

119. Had ZBS warned doctors and the FDA of the known failure rate and known issues with the device plaintiff may have selected an alternative Device or may have waited until the issues with the device were fixed before she underwent an invasive and painful surgery only to have to explain the Device and become permanently disabled as a result.

21

120.    Defendants knew or should have known that the device was unreasonably dangerous and that it could create a substantially increased risk of serious bodily harm to reasonably foreseeable consumers, including the plaintiff, and defendants failed to adequately warn of such increased risk. For example, plaintiff had suffered additional damage to her spine as a result of maintaining that defective Device implanted.

121.    The device was also defective because of inadequate post marketing warnings or instructions because the defendant failed to provide adequate warnings to consumers after the defendant knew or should have known of the risk of serious bodily harm for the intended or foreseeable use of the products.

122.    As a direct and proximate result of defendant's wrongful conduct plaintiff has sustained and will continue to sustain severe physical injuries, loss of mobility, unnecessary surgery, severe emotional distress, economic losses, and other damages for which they are entitled to recover in an amount to be true proven at trial.

123.    Defendants are liable to plaintiff for all general, special, and equitable relief to which plaintiff is entitled by law.

## COUNT IV

### BREACH OF IMPLIED WARRANTY

124.    Plaintiff incorporates by reference the factual allegations of the preceding paragraphs as is fully set forth herein.

125.    CDRH does not evaluate information related to contract liability warranties. The

Supreme Court considered the topic of warranties and federal preemption in *Cipollone v Liggett Group, Inc.*, 505 U.S. 504 (1992). Supreme Court observed that express warranties are not imposed by state law but rather imposed by the warrantor. The court wrote "[a] common law remedy for contractual commitment voluntarily undertaken should not be regarded as a 'requirement... imposed under state law period" *Id.*

126. Additionally, ZBS promoted the device to surgeons and consumers indicating and touting the superiority of the Device.

127. Defendants controlled the design, marketing, and sale of the device at issue and place them in the stream of commerce.

128. By offering the devices for sale, defendants expressly and impliedly warranted to plaintiff that they were merchantable quality, safe and fit for the intended purpose.

129. The devices were not of merchantable quality and could not safely be used for their intended purpose. The defects that caused this to be the case were not disclosed to the plaintiff.

130. Plaintiff used devices in reliance upon the express and implied warranties of the defendants.

131. Plaintiff suffered damages because she was implanted with a dangerous device that was neither merchantable nor fit for its intended purpose.

132. ZBS, and their manufacturing, design, construction, assembling, testing, inspecting, packaging, labeling, engineering, selling, supplying and distributing, expressly and impliedly warranted the fitness of their device for the intended purpose.

133. ZBS impliedly warranted that its device, which ZBS designed, manufactured, assembled, promoted and sold to plaintiffs, was merchantable and fit and safe for ordinary use and was fit for their particular purpose including withstanding the normal spinal load.

23

134.     As a result of a manufacturing defect and violations of applicable CGMP requirements ZBS's device was defective, unmerchantable, and unfit for ordinary use when sold, and unfit for the particular purpose for the which they were sold, and subjected plaintiff to severe and permanent injuries.

135.     ZBS breached the implied warranties of merchantability and fitness for a particular purpose when their device was sold to plaintiffs, in that the device failed to function as intended.

136.     California law and cases

137.     Upon information and belief ZBS represented its devices as superior in several ways in comparison to its competitors.

138.     ZBS device implanted in plaintiff failed to live up to the promises of safety and implied warranties alleged by ZBS.

139.     Privity also exists between NZBS and plaintiff on a theory of agency to the extent that the physician was acting as an agent of the manufacturer with regard to the describing the risk, benefits, and instructions for the use of the device. In order for plaintiff's surgeon to obtain plaintiffs informed consent for the procedure, the physician disclosed the perceived differences between ZB's competitor device and disclose these differences to plaintiff. After a discussion with her surgeon regarding the known risks, benefits and alternatives, the physician and plaintiff chose to implant ZB's defective device substantially because of the warranties made by ZBS. Specifically, ZBS had indicated a certain superiority of its products and the reasonable expectation for plaintiff was that the device would work as intended.

140.     Any purported disclaimers of implied warranties are ineffectual as they were not provided to plaintiff otherwise made known to plaintiff. In addition to any such disclaimers are unconscionable.

24

141. California law

142. Any disclaimer of consequential damages is invalid as a limited remedy provided fails in its essential purpose to redress the harm and personal injury to plaintiff in that it, in effect, provides no remedy at all for the defect necessary to be redressed.

143. In addition, any such disclaimer of consequential damages is unconscionable.

144. As a direct and proximate result of ZB's breach of implied warranties, plaintiff sustained economic losses and other damages for which they are entitled to compensatory and equitable damages in an amount to be proven at trial.

145. California law

## COUNT V

### GENERAL NEGLIGENCE

146. Plaintiff incorporates by reference the factual allegations of the preceding paragraphs as if fully set forth herein.

147. California law.

148. At all times, defendants had a duty to use reasonable care in selecting, marketing, and selling the items to consumers and surgeons.

149. Pursuant to federal regulations, manufacturers must report adverse events associated with a medical device to the FDA within 30 days after the manufacturer becomes aware that a device may have caused or contributed to serious injury, or that a device has malfunctioned and would

25

be likely to cause or contribute to serious injury if the malfunction were to recur. Such reports must contain all information reasonably known to the manufacturer, including any information that can be obtained by analysis, testing, or other evaluation of the device, and any information in the manufacturer's possession. In addition, manufacturers are responsible for conducting an investigation of each adverse event and must evaluate the cause of the adverse event. 21 C.F.R. Part 803.50.

150. Pursuant to federal regulations ZBS must also describe in every individual adverse event report well the remedial action was taken in regard to the adverse event, and whether the remedial action was reported to the FDA as a removal or correction of the device. 21 C.F.R. Part 803.52

151. Pursuant to federal regulations, manufacturers must report to the FDA within five (5) business days after becoming aware that in MDR reportable event necessitates remedial action to prevent an unreasonable risk of substantial harm to public health. 21 C.F.R. Part 803.53. And MDR reportable event is, among other things, an event that makes a manufacturer aware that a device marketed by the manufacturer has malfunctioned or may have caused or contributed to a death or serious injury. 21 C.F.R. Part 803.3.

152. Similarly, device manufacturers must report promptly to the FDA any device corrections and removals and maintain records up to vice corrections and removals. FDA regulations require submission of a written report within 10 working days of any correction or removal of a device initiated by the manufacturer to reduce risk to health posed by the device, or to remedy a violation of federal law caused by the device that may present a risk to health. The written submission must contain, among other things, a description of the event giving rise to the information reported and the corrective or removal actions taken and any illness or injuries that have occurred with the use of the device, including reference to any device or port numbers. Manufacturers must also indicate the total number of devices manufactured or distributed which are subject to the

correction or removal and provide a copy of all communications regarding the correction or removal. 21 C.F.R. Part 806.10.

153. Upon information and belief, pursuant to its approved PMA, ZBS must submit an "Adverse Reaction Report" or "Device Defect Report" Within 10 days after Advanced Bionic receives or has knowledge of information concerning any "adverse reaction, side effects, injury, toxicity, or sensitivity reaction that is attributable to the device and quote and ( a ) has not been addressed by the devices labeling or ( b ) has been addressed by the devices labeling, but has occurring with unexpected severity or frequency.

154. BS must submit an "Adverse Reaction Report" or "Device Defect Report" pursuant to 21 C.F.R. Party 814.82(a)(9) within 10 days after Advanced Bionic receives or has knowledge of information concerning any "adverse reaction" and (a) has not been addressed by the device's labeling or (b) has been addressed by the device's labeling but is occurring with unexpected severity or frequency.

155. ZBS's failure to meet the above referenced federal requirements applicable to medical devices and ZBS's other acts and omissions as described herein directly and proximately caused the subject device to be in violation of federal law, adulterated, unfit for sale, defective and unreasonably dangerous and approximate and legal cause of harm to plaintiff.

156. Plaintiffs state law claims against ZBS are premised, inter alia, on ZBS's violation of federal regulations, and are parallel state laws requirements that do not conflict with and are not in addition to or different from federal requirements.

157. At all relevant times, defendants knew or reasonably should have known that its device was unreasonably dangerous and defective when used for its intended purpose, and that plaintiff, being among foreseeable users who could be exposed to harm, would foreseeably suffer injury as a result of defendant's failure to exercise reasonable care period.

27

158. Defendants failed to modify or otherwise recall its unsafe products and otherwise failed to warn the FDA, or the implanting surgeons or the consumers of the dangers which defendants knew or should have known existed to such consumers or anyone who would use the device in question.

159. Defendants breached their duty of reasonable care to plaintiff by failing to notify and warn the FDA, plaintiffs treating physicians, plaintiff and the public at the earliest possible date of known design or manufacturing defects in the Device.

160. Defendants breached their duty of reasonable care to plaintiff by failing to exercise due care under the circumstances by deviating from the specifications of approved by the FDA and or making changes to the design manufacturing or assembly of the devices that the FDA had not approved or authorized.

161. As a direct and proximate result of defendant's wrongful conduct, including failure to comply with applicable FDA requirements and FDA approved Device specifications, plaintiff has sustained and will continue to sustain severe physical injuries, loss of mobility, painful surgery, severe emotional distress, economic losses, and other damages for which they are entitled to compensatory damages and an amount to be proven at trial.

162. Upon information and belief, defendants further breached their duty by allowing the defectively manufactured device to be sold and marketed even after it was aware of the defects with the device as early as late 2016.

163. Upon information, defendants carelessly and negligently concealed the defects and the Device from the FDA, physicians and plaintiff, and carelessly and negligently misrepresented the quality, safety, and usefulness of the Device to the FDA, to physicians and the consumers. Defendants should have realized that such conduct involved in unreasonable risk of causing emotional distress to reasonable persons that might in turn result in illness or bodily harm.

164. Defendants owed a duty to treating physicians, recipients of the device, and families of the recipients, including plaintiff, to accurately and truthfully represent the risks of the Device. Defendants breached that duty by misrepresenting and or failing to adequately warn of the risks of the Device- effects of which defendants knew or in the exercise of diligence should have known- to the treating physician and plaintiff.

165. A reasonable manufacturer/ distributor/ seller would have investigated the defects as required by federal law, would have identified the issues related to safety and efficacy as required by FDA and would have recalled the products based on this investigation before the Device having been implanted into plaintiff requiring extensive pain and suffering.

166. The likelihood and gravity of the harm presented by the defects known to be present in the Device were foreseeable and were not timely shared with the consumers or the FDA.

167. The product defects alleged above were substantial factors contributing to the cause of injuries and damages suffered by plaintiff.

168. As a direct and proximate cause of the negligence of defendants, plaintiff suffered, and will continue to suffer, personal injuries, including but not limited to, medical bills, scarring and discoloration, loss of past and future earnings, severe emotional distress anxiety, lacerations, contusions, general damages and other economic and non-economic damages in an amount to be proven at trial.

169. ZBS's deviation from the requirements of federal law was also negligent as a matter of law. By failing to adhere to the PMA and CGMP requirements meant to ensure the safety and efficacy of the Device, ZBS was negligent and breached duty of care causing damages to the plaintiff.

170. Upon information and belief, ZBS was negligent in the testing of its device and failed to

notify the FDA or deviations found in certain lots with those specifications approved by the FDA.

171.     A violation of federal laws and regulations establishing a standard of conduct may provide the basis for a state law Negligence Per Se claim (California case law entered)

## PRAYER FOR RELEIF

WHEREFORE, Plaintiff praise for judgment against all defendants, and each of them, for each cause of action as follows:

1.  For all special damages including but not limited to, lost wages reimbursements of medical and other related bills, future medical bills, and the reasonable value of the loss of services;

2.  For all general damages including but not limited to, damages for pain, suffering, anguish, discomfort, severe emotional distress, disgust, terror, freight, anger, anxiety, worry, nervousness, shock, anguish, and mental suffering, loss of enjoyment of life, loss of ability to engage in normal and customary activities, loss of comfort, society, care, and companionship;

3.  Reasonable costs and attorneys fees;

4.  Statutory prejudgment interest;

5.  For other and further special damages in a sum according to proof at the time of trial;

6.  For other and further general damages in Assam according to proof at the time of trial;

7.  and for the cost of suit incurred herein; And

8.  First such other in future relief as the court deems just improper.

OCT 0 4 2023